

SO ORDERED.

Robert J. Faris
United States Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF HAWAII

| | |
|---|---|
| In re | Case No. 13-00757 |
| | Chapter 7 |
| JAMES J. WOOD, JR. and MARILYN S. WOOD, | |
| Debtors. | |
| CHARLES M. BENCH and YU NEU BENCH, aka HELEN BENCH, | Adv. Pro. No. 13-90060 |
| Plaintiffs, | |
| vs. | |
| JAMES J. WOOD, JR., MARILYN S. WOOD, and UNIVERSAL FENCE, LLP, | Re: Docket No. 1 |
| Defendants. | |

## AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW

The trial of this adversary proceeding was held on April 6 and 7, 2015.

Preston Gima represented the plaintiffs and Donald L. Spafford, Jr., represented

defendant Marilyn S. Wood. Defendants James J. Wood, Jr., and Universal Fence, LLP, did not appear at trial; judgment shall be entered against them by default.

Based on the evidence, the court makes the following:

## FINDINGS OF FACT

1.      Plaintiffs Charles and Helen Bench are a married couple in their mid-seventies. They have many years of experience in the real estate business.

2.      Defendants James and Marilyn Wood were married during the relevant time period (they are now in the process of divorcing).

3.      Charles and Helen[1] met James and Marilyn in about April 2008, when James and Marilyn expressed an interest in renting a house from Charles and Helen. James and Marilyn rented the house beginning on May 1, 2008.

4.      James and Marilyn became friendly with Charles, Helen, and their son Rick. Charles and Helen grew to like and trust James and Marilyn.

5.      According to Charles and Helen, James told them that he had attended the Massachusetts Institute of Technology. Marilyn did not know that James had made this statement. (Although it is implausible that James attended MIT, there is no evidence in the record that he did or did not attend that institution.)

6.      In 2011, James and Marilyn were working for a company that rented

---

[1] I will sometimes use the parties' first names strictly for convenience and without intending any disrespect.

2

temporary fences to enclose construction sites. They and another employee of that company wanted to go into the fence rental business for themselves. They agreed to form a company. James was to be in charge of operations, the co-worker was to be in charge of bidding and contracts, and Marilyn was to be the bookkeeper. Marilyn had no experience in the fence rental business and had learned to be a bookkeeper solely through on-the-job training.

7.      In May 2011, James and Marilyn approached Charles and Helen for a loan to start their new business. They told Charles and Helen that lots of federal and state contracts were available and that they were sure the business would be successful. James gave some written materials to Charles and Helen that apparently included a business plan and some financial projections for the new business. James did most of the talking; Marilyn attended the meetings and assured Charles and Helen that James was a hard worker who would do his best to make the business succeed.

8.      Charles and Helen did not retain copies of the written materials, and they are not part of the record.

9.      Marilyn did not prepare any of the written materials that James gave to the Benches. Marilyn did not know that any of the statements she or James made to Charles and Helen were false. Marilyn did not intend to deceive Charles and Helen.

10.     A few years earlier, James was convicted of interstate transportation of stolen goods and imprisoned. Marilyn did not conceal this fact from Charles and

U.S. Bankruptcy Court - Hawaii   #13-90060   Dkt # 97   Filed 07/22/15   Page 3 of 23

Helen for the purpose of inducing Charles and Helen to make the loans.

11.     Although Charles and Helen are elderly, they are experienced in business and capable of managing their own affairs. They had a friendly, trusting relationship with James and Marilyn, but James and Marilyn did not exert undue influence over them. Charles and Helen had no reasonable basis to believe that James and Marilyn would put the Benches' interests ahead of their own.

12.     Charles and Helen agreed to make a loan. Although they initially expected to lend the money to James and Marilyn, by the time they lent the money they knew that the borrower would be Universal Fence, LLC. The Promissory Installment Note, dated May 25, 2011, was made by Universal Fence, LLC, and signed by Marilyn as its president.[2] Many of the Benches' checks indicated "Universal Fence" in the memo section and others were made payable to Universal Fence, LLC.

13.     Charles and Helen testified that an attorney for James and Marilyn prepared the note. Marilyn testified that Charles and Helen's attorney prepared it. Based on the inartful drafting of the note, I find that it was not prepared by an attorney; rather, James probably created it.

14.     The note evidences an obligation of $86,000. $27,500 was lent on the date of the note and more was lent later. Neither party kept careful records of the

---

[2] Exhibit 4.

4

amount that was lent and some of the loan was treated as a rent credit. It appears that, by late June 2011, the total loans including rent credits were at least $86,000.

15.     The note provides that:

> Any and all assets of Universal Fence, LLC shall be held as collateral for the repayment of this note. Furthermore none of the assets of Universal Fence, LLC may be traded, sold, pledged or disposed of in any manner without the express written consent of [Charles and Helen].

The Benches never took any steps to perfect a security interest in Universal Fence, LLC's property.

16.     On May 27, 2011, Universal Fence, LLC was formally organized. Marilyn was its sole member. James was an employee, and was never a member, of Universal Fence, LLC.

17.     In May or June 2011, Universal Fence bid on the "Actus Redhill Makai" job. The general contractor notified Universal Fence that it had submitted the low bid and James and Marilyn believed that Universal Fence would get the contract. James began to purchase material and build the fence panels for the project before the contract was awarded.

18.     In or around July 2011, James and Marilyn asked the Benches for another loan. They said that the business was going well but they were having some temporary cash flow problems. They said they were working full time on the business and were not taking any money out of the business. (James drew a salary of $1,000

U.S. Bankruptcy Court - Hawaii   #13-90060   Dkt # 97   Filed 07/22/15   Page 5 of 23

per week from Universal Fence. When James and Marilyn told Charles and Helen that they were "not taking any money out of the business," they did not mean that James was not getting paid a modest amount for his efforts. Charles and Helen knew that James and Marilyn had no other source of income to support themselves and their children. They could not have believed that James and Marilyn were both working without any pay.) By this time, they had fallen behind in paying the rent on the house they were renting from Charles and Helen.

19. Charles and Helen agreed to make additional loans. Although the records are unclear, Charles and Helen apparently lent an additional $71,000 between July and September 2011. During part of this time, Marilyn was in Kansas caring for her mother; consequently, she did not know about all of the loans that James took during this period until after the fact.

20. In August or September 2011, James and Marilyn asked for another loan. They told the Benches that they had some extremely serious cash flow problems and needed cash immediately. They said that they had many contracts and could begin to repay the Benches if the Benches would help solve their cash crisis.

21. Charles and Helen agreed to lend an additional $10,000. Universal Fence LLC signed a document entitled "Promissary [sic] Note" on September 22, 2011 in

6

the amount of $46,000.[3] A handwritten note at the bottom of the document indicates that the $46,000 included $30,000 received in July 2011, $10,000 received on September 22, 2011, and $6,000 for rent for September and October 2011. (In reality, the Benches had lent more than $30,000 in July and August 2011, but neither party had kept careful track. Marilyn believed that the figures at the bottom of the note were correct and did not intend to deceive the Benches.)

22.     The document provides that $20,000 was "to be paid on first installment of Actus Redhill Makai project," and that "Remaining Twenty six Thousand terms not yet determined by Bench and Universal Fence."

23.     The document also contains the same language about collateral that was in the first note.

24.     In October or November 2011, Marilyn learned that Universal Fence was not going to get the Actus Redhill Makai job. When Helen asked Marilyn about the status of that job (because James and Marilyn had promised to pay them $20,000 out of the first draw on that job), Marilyn told her that she would have to speak to James. Marilyn did this because James knew more than Marilyn about the company's bids and contracts. Marilyn believed that James would accurately explain the situation to the Benches; she did not intend to deceive the Benches.

---

[3] Exhibit 6.

7

25.     In or around February 2012, James and Marilyn told Charles and Helen that they were once again suffering cash flow problems and needed another loan. James and Helen had failed to pay the rent for January and February 2012 and Charles and Helen had not received the first $20,000 payment on the second note. Nevertheless, Charles and Helen lent another $10,000.

26.     On February 16, 2012, Universal Fence, LLC, signed a document entitled "Promissary [sic] Note" in the amount of $10,000. The note states that the collateral would be "any and all assets of Universal Fence LLC" but, unlike the first two notes, did not restrict dispositions of the collateral.

27.     Also in February 2012, James decided that Universal Fence should obtain a contractor's license so it could build permanent fences. A friend of his named Chris Summo had a contractor's license and was willing to allow Universal Fence to use it. On February 27, 2012, Universal Fence, LLC, changed its name to Universal Fence Joint Venture, LLC. At some point (the record does not indicate the exact date), the company admitted Mr. Summo or his LLC as a member. The name change and the admission of another member did not affect the Benches' practical or legal rights.

28.     James wanted to get a loan with which to repay the Benches and recapitalize the company. Universal Fence could not get a loan without a guarantor. Another friend of James, Andrew Souza, agreed to become a partner in the business

U.S. Bankruptcy Court - Hawaii  #13-90060  Dkt # 97  Filed 07/22/15  Page 8 of 23

and act as guarantor. On March 8, 2012, Universal Fence Joint Venture, LLC was converted to Universal Fence LLP. At some point (the record does not indicate the exact date), Mr. Souza was admitted as a partner. This change did not affect the Benches' legal or practical rights; Universal Fence LLP acquired all of the assets and became liable for all of the debts of Universal Fence Joint Venture LLC, the new name of Universal Fence, LLC.

29.     Even with the financial backing of Mr. Souza, the company could not get a new loan.

30.     On March 23, 2012, Universal Fence made a partial payment of $5,000 on the third note.

31.     Universal Fence became unable to make payroll and went out of business around March 2012.

32.     After the first loan, James and Marilyn occasionally gave Charles and Helen lists of Universal Fence's existing and pending contracts. Only one such list, dated November 12, 2012, was introduced in evidence.[4] There is no evidence that the lists were false, that Marilyn prepared them, that Marilyn knew or should have known they were false, that Marilyn intended to use them to deceive Charles and Helen, or that Marilyn knew or should have known that James intended to use them to deceive

---

[4] Exhibit 9.

U.S. Bankruptcy Court - Hawaii   #13-90060   Dkt # 97   Filed  07/22/15   Page 9 of 23

Charles and Helen.

33.     After the last loan, James told Charles and Helen that Universal Fence was on the verge of success and that he would be able to repay them. During this period, Marilyn deflected Charles and Helen's questions to James. None of the loans was repaid (except for the $5,000 partial payment referred to above) and James and Marilyn paid no rent beginning in January 2012.

34.     Marilyn never made any statements to Charles or Helen which she knew or believed to be false and did not knowingly engage in any deceptive conduct. Marilyn never intended to deceive Charles or Helen. Marilyn did not know and had no reason to suspect that any statements James made to Charles or Helen were false or that James intended to deceive Charles or Helen.

35.     At the time of each loan, Marilyn intended that Universal Fence would repay it and sincerely believed that Universal Fence would be able to repay it.

36.     Marilyn did not intend to injure the Benches and did not know that her actions (or James' actions) were substantially certain to harm the Benches.

37.     James and Marilyn filed a chapter 7 bankruptcy petition on May 6, 2013. Their schedule of personal property included the following:

> Co-debtor [Marilyn] is one of two partners in Universal Fence LLP. Partnership assets are estimated at $120,000 and liabilities are estimated at $500,000. Business value is estimated at $0.00.

38.     After the bankruptcy filing, James told Charles and Helen that he

U.S. Bankruptcy Court - Hawaii   #13-90060   Dkt # 97   Filed 07/22/15   Page 10 of 23

intended to repay them and that Universal Fence still had a substantial amount of inventory and no more expenses. Marilyn made no such statement and did not know that James had made such a statement. There is no evidence that the requirements of a valid reaffirmation agreement were fulfilled.

Based on these findings of fact, I draw the following

## CONCLUSIONS OF LAW

### I.    JURISDICTION AND VENUE

1.    The court has personal jurisdiction over the defendants and jurisdiction of the subject matter. The bankruptcy court has statutory and constitutional power to enter a final judgment. Venue is proper in this district.

### II.    SECTION 523(A)(2)

#### A.    In General

2.    A chapter 7 discharge does not not discharge an individual from any debt for money to the extent that the debtor obtained it by "false pretenses, a false representation, or actual fraud . . . ."[5] The plaintiff must prove five elements:

(i)    Misrepresentation, fraudulent omission, or the debtor's deceptive conduct;

(ii)    Knowledge of the falsity or deceptiveness of his statement or conduct;

_____

[5] 11 U.S.C. § 523(a)(2)(A).

11

(iii)     An intent to deceive;

(iv)     Justifiable reliance by the creditor on the debtor's statement or conduct; and

(v)     Damage to the creditor proximately caused by its reliance on the debtor's statement or conduct.[6]

**B.     Fraudulent Omission**

3.     The plaintiff can prove that a debtor engaged in a fraudulent omission if he proves that, first, there was a duty to disclose a material fact; second, the debtor did not disclose that fact; and, third, the debtor's omission was motivated by an intent to deceive.[7]

4.     The Supreme Court has held that the common law in force when section 523 was passed and the Restatement (Second) of Torts should guide courts' interpretation of section 523(a)(2)(A).[8] Following that direction, the Ninth Circuit has relied on the Restatement when discussing the duty to disclose.[9]

---

[6] *Oney v. Weinberg (In re Weinberg),* 410 B.R. 19, 35 (B.A.P. 9th Cir. 2009).

[7] *Citibank (South Dakota), N.A. v. Eashai (In re Eashai)*, 87 F.3d 1082, 1089 (9th Cir. 1996); *Harmon v. Kobrin (In re Harmon),* 250 F.3d 1240, 1246 n. 4 (9th Cir. 2001) ("A debtor's failure to disclose material facts constitutes a fraudulent omission under § 523(a)(2)(A) if the debtor was under a duty to disclose and the debtor's omission was motivated by an intent to deceive.") (citing *Eashai*, 87 F.3d at 1089-90).

[8] *Field v. Mans*, 516 U.S. 59, 70 (1995); *Apte v. Japra, M.D., F.A.C.C., Inc. (In re Apte)*, 96 F.3d 1319, 1323-24 (9th Cir. 1996).

[9] *Eashai*, 87 F.3d at 1089; *Apte*, 96 F.3d at 1323-24.

12

U.S. Bankruptcy Court - Hawaii   #13-90060   Dkt # 97   Filed 07/22/15   Page 12 of 23

5.     Section 551 of the Restatement explains that a party to a business transaction has a duty to disclose the following facts once the transaction is consummated:

> (a) matters known to him that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them; and
>
> (b) matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and
>
> (c) subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so; and
>
> (d) the falsity of a representation not made with the expectation that it would be acted upon, if he subsequently learns that the other is about to act in reliance upon it in a transaction with him; and
>
> (e) facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.[10]

## C.     Fraud About Future Events

6.     The first prong of the five-part 523(a)(2)(A) test "'[must] encompass statements that falsely purport to depict *current or past facts*. [A debtor's] promise . . . related to [a] future action [which does] not purport to depict current or past fact . . . therefore cannot be defined as a *false representation or a false pretense*.' "[11] Simply failing to

---

[10] Restatement (Second) of Torts, § 551 (1977).

[11] *In re Bercier*, 934 F.2d 689, 692 (5th Cir. 1991) (quoting *In re Roeder*, 61 B.R. 179, 181 (Bankr. W. D. Ky. 1986)) (emphasis in original).

U.S. Bankruptcy Court - Hawaii  #13-90060  Dkt # 97  Filed 07/22/15  Page 13 of 23

perform a promise does not make a debt nondischargeable under section 523(a)(2)(A).[12]

7.     A misrepresentation about a debtor's intention to perform a promise may, however, be grounds for a nondischargeability claim.[13] Thus, the touchstone is whether the debtor intended to perform his promise when he made it.

8.     The use of a financial projection which the debtor subjectively believed to be false or misleading might also satisfy section 523(a)(2).

## D.     Imputed Knowledge That A Statement Is False

9.     If a debtor did not have actual knowledge of a spouse's misrepresentation, the knowledge cannot be imputed to her simply because of her marriage.[14] In order to impute knowledge of a fraudulent omission or misrepresentation, there must be a legal basis to do so.[15] "The nondischargeability decisions addressing imputed conduct, intent and liability are based on long-established principles of agency and vicarious liability."[16]

10.     James was an employee of an LLC of which Marilyn was a member and

---

[12] 4-523 Alan N. Resnick & Henry J. Sommer, *Collier on Bankruptcy* ¶ 523.08[d] (16th ed. 2015).

[13] *Id.*

[14] *Tsurukawa v. Nikon Precision, Inc. (In re Tsurukawa)*, 287 B.R. 515, 527 (B.A.P. 9th Cir. 2002).

[15] *Id.*

[16] *Bendetti v. Gunness (In re Gunness)*, 501 B. R. 1, 6 (B.A.P. 9th Cir. 2014).

14

later an LLP of which she was a partner. An employer is liable for an employee's tortious conduct.[17] But the members of an LLC and the partners of an LLP are generally not liable for the debts of the entity simply because of their membership in the LLC or their partnership in the LLP.[18]

### E.    Section 523(a)(2) Applied To This Case

11.    Marilyn did not knowingly or intentionally make any false statements to the Benches.

12.    Marilyn did not fraudulently omit facts from her statements to the Benches.

(a)    There was no "fiduciary or similar relation of trust or confidence" between the Benches and the Woods. The couples were friendly, and the Benches are elderly, but the Benches could not reasonably have expected the Woods to put the Benches' interests ahead of their own.

(b)    Marilyn did not know of any matters which she knew had to be disclosed in order to complete or disambiguate any statement by her or James.

(c)    Marilyn did not acquire, or fail to transmit to the Benches, any information that she knew would make untrue or misleading a prior statement made

---

[17] Restatement (Third) of Agency § 2.04.

[18] Haw. Rev. Stat. §§ 428-303(a) (tort liabilities of an LLC are "solely" the liabilities of the company and members are not liable "solely by reason of being or acting as a member or a manager."); 425-117(c) (same as to LLPs).

U.S. Bankruptcy Court - Hawaii   #13-90060   Dkt # 97   Filed 07/22/15   Page 15 of 23

by her or James. She and James had told the Benches about the Actus Redhill Makai job. When Universal Fence was not awarded that contract, Marilyn acted reasonably when she referred the Benches to her husband, who was more knowledgeable than Marilyn about the company's contracts and whom Marilyn reasonably expected would tell the truth to the Benches.

          (d)    The fourth and fifth categories of facts that a party to a business transaction must disclose under section 551 of the Restatement are not present here.

13.    Marilyn did not engage in deceptive conduct toward the Benches.

14.    There is no legal basis to impute to Marilyn any misrepresentations made by James, James' knowledge concerning his representations, or his intentions.

15.    The Benches have not carried their burden of proof on their section 523(a)(2) claims against Marilyn.

## II.   SECTION 523(A)(6)

16.    A debt "for willful and malicious injury by the debtor" is also not dischargeable.[19] To prevail, the plaintiff must establish both willfulness and malice.

17.    An injury is "willful" if the (1) "the debtor had a subjective motive to inflict the injury" or (2) "the debtor believed that injury was substantially certain to occur as a result of his conduct."[20] The touchstone of this standard is that the debtor

---

[19] 11 U.S.C. § 523(a)(6).

[20] *In re Jercich*, 238 F.3d 1202, 1208 (9th Cir. 2001).

U.S. Bankruptcy Court - Hawaii   #13-90060   Dkt # 97   Filed 07/22/15   Page 16 of 23

must have intended to injure the creditor. It is not enough to prove that the debtor acted intentionally and caused an injury.[21]

18.     Marilyn did not intend to injure the Benches and did not know that her actions (or James' actions) were substantially certain to injure the Benches. Therefore, the Benches have not carried their burden of establishing that Marilyn acted "willfully" within the meaning of section 523(a)(6).

19.     To prove that the debtor acted maliciously, the creditor must show four elements: "'(1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse.'"[22]

20.     Marilyn did not intentionally do anything that would necessarily have injured the Benches. Therefore, the Benches have not carried their burden of establishing that Marilyn acted "maliciously" within the meaning of section 523(a)(6).

21.     The Benches argue that the Woods converted property in which the Benches had a security interest. A claim of conversion can fulfill the willful and malicious requirements. To prove conversion, the plaintiff must show "'(1) A taking from the owner without his consent; (2) an unwarranted assumption of ownership; (3) an illegal use or abuse of the chattel; and (4) a wrongful detention after

---

[21] *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998).

[22] *Jercich*, 238 F.3d at 1209 (quoting *In re Bammer*, 131 F.3d 788, 791 (9th Cir.1997) (en banc)).

17

demand.'"[23] There was no conversion here because the Benches voluntarily lent their money to Universal Fence and there is no evidence of any illegal use or abuse of any of Universal Fence's property in which the Benches claim an unperfected security interest.

## III.    SECTION 523(A)(4)

22.    Section 523(a)(4) excepts from discharge debts "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."

23.    Federal law defines the terms in this federal statute.[24] State law definitions of the same or similar terms are irrelevant.

### A.    Fraud or Defalcation in a Fiduciary Capacity

24.    The Ninth Circuit has adopted a narrow definition of "fiduciary capacity."[25] A person acts in a fiduciary capacity if there was either (a) an express trust or (b) a technical trust.[26] The fact that state law imposes a "fiduciary duty" on a party does not necessarily mean that the party occupies a "fiduciary capacity" under section 523(a)(4).

---

[23] *Sung v. Hamilton*, 710 F. Supp. 2d 1036, 1043-44 (D. Haw. 2010) (quoting *Tsuru v. Bayer*, 25 Haw. 693, 1920 WL 830, *2 (Haw.Terr.1920)).

[24] *Cal-Micro, Inc. v. Cantrell (In re Cantrell)*, 329 F.3d 1119, 1125 (9th Cir. 2011) (holding that federal law defines "fiduciary capacity" and "fraud or defalcation"); *Ormsby v. First Am. Title Co. (In re Ormsby)*, 591 F.3d 1199 (9th Cir. 2010) ("[A] bankruptcy court is not bound by the state law definition of larceny . . . .").

[25] *Id.*

[26] *Id.*

U.S. Bankruptcy Court - Hawaii   #13-90060   Dkt # 97   Filed 07/22/15   Page 18 of 23

25.     Marilyn did not act in a "fiduciary capacity" toward the Benches.

**B.     Embezzlement**

26.     To prove embezzlement, the plaintiff must show three elements:

(i)     An appropriation of funds for the debtor's own benefit by
fraudulent intent or deceit;

(ii)     The deposit of the resulting funds in an account accessible only
to the debtor; and

(iii)     The disbursal or use of those funds without explanation of reason
or purpose.[27]

27.     Marilyn did not appropriate any funds from the Benches by fraudulent
intent or deceit. The funds which the Benches lent were used for the intended
purpose: to fund the business of Universal Fence.

**C.     Larceny**

28.     A debtor commits larceny within the meaning of section 523(a)(4) if she
commits a "'felonious taking of another's personal property with intent to convert it
or deprive the owner of the same.'"[28] Therefore, the plaintiffs must prove (1) they
owned the property at issue; (2) the debtor took their property; and (3) the debtor did

---

[27] 4-523 Alan N. Resnick & Henry J. Sommer, *Collier on Bankruptcy* ¶ 523.10[1][d][2] (16th ed.
2015) (citing *In re Bryant*, 28 C.B.C.2d 184, 147 B.R. 507 (Bankr. W.D. Mo. 1992)).

[28] *Id.* (quoting  4-523 Alan N. Resnick & Henry J. Sommer, *Collier on Bankruptcy* ¶ 523.10[2]
(15th ed. 2008)).

U.S. Bankruptcy Court - Hawaii   #13-90060   Dkt # 97   Filed 07/22/15   Page 19 of 23

so with the intent to keep the property or to deprive the plaintiffs of the property.

29. When Marilyn participated in the Benches' loans, she intended and believed that Universal Fence would repay those loans. Thus, she did not intend to deprive the Benches of their property.

## IV. SECTION 727(A)(3)

30. The court must deny a discharge if the debtor, "with intent to hinder, delay, or defraud a creditor or an officer of the estate . . ., has concealed . . . property of the debtor . . . or . . . property of the estate . . . ."[29]

31. Courts construe section 727 "'liberally in favor of the debtor and strictly against parties objecting to discharge.'"[30]

32. The Benches claim that James and Marilyn concealed the remaining inventory and accounts of Universal Fence.

33. The property of an LLC of which the debtor is a member, and the property of an LLP in which the debtor is a partner, is the property of the entity and not property of the debtor. In Hawaii, LLCs and LLPs are legal entities separate from their owners with the power to own property.[31] It follows that if property does not

---

[29] 11 U.S.C. § 727(a)(2).

[30] *Retz v. Samson (In re Retz)*, 606 F.3d 1189, 1196 (9th Cir. 2010) (quoting *Bernard v. Sheaffer (In re Bernard)*, 96 F.3d 1279, 1281 (9th Cir.1996)).

[31] Haw. Rev. Stat. §§ 428-201 (2015) ("A limited liability company is a legal entity distinct from its members); 428-111(b)(2) (a limited liability company has the power to own property); 425-108(a) ("A partnership is an entity distinct from its partners."). The court may disregard the separate entity status if "recognition of the corporate fiction would bring about injustice and

20

U.S. Bankruptcy Court - Hawaii   #13-90060   Dkt # 97   Filed 07/22/15   Page 20 of 23

belong to the debtor pre-petition, then it cannot belong to the estate post-petition.

34. Further, the Woods' schedules contain an adequate disclosure of the assets and liabilities of Universal Fence and the value of their interest in it.

35. Section 727(a)(3) therefore does not require denial of Marilyn's discharge.

## V. SECTION 727(A)(4)

36. The court may not grant a discharge if the debtor "knowingly and fraudulently in connection with the [bankruptcy] case . . . made a false oath or account . . . ."[32] To prevail on this claim, the plaintiff must prove four elements: "'(1) the debtor made a false oath in connection with the case; (2) the oath related to a material fact; (3) the oath was made knowingly; and (4) the oath was made fraudulently.'"[33]

37. The Benches argue that the Woods did not disclose the fact that Universal Fence continued to pay a salary to James while the bankruptcy was still pending.

38. The only evidence at trial to support this theory was Marilyn's

inequity or when there is evidence that the corporate fiction has been used to perpetrate a fraud or defeat a rightful claim." *Chung v. Animal Clinic, Inc.*, 636 P.2d 721, 723 (Haw. 1981). The evidence does not support "piercing the veil" of Universal Fence.

[32] 11 U.S.C. § 727(a)(4)(A).

[33] *Id.* at 1197 (quoting *Roberts v. Erhard (In re Roberts)*, 331 B.R. 876, 882 (9th Cir. BAP 2005)).

21

testimony. Her memory of the date on which Universal Fence stopped paying James was uncertain at best. This evidence does not support a determination that she knowingly and fraudulently made a false oath in connection with the case.

39.    Moreover, earnings from personal services rendered after the bankruptcy petition are not property of the bankruptcy estate.[34] The bankruptcy trustee had no right to James' postpetition salary. James' postpetition salary, if any, was not a material fact in the bankruptcy case.

## VI.    REAFFIRMATION

40.    A debtor may reaffirm a debt that would otherwise be discharged only if certain requirements have been met.[35] There must have been an agreement before the debtor was granted a discharge.[36] The debtor must have received certain disclosures before or at the time of reaffirmation.[37] The agreement must have been filed with the court along with a declaration or affidavit alleging certain facts.[38] The agreement cannot have been rescinded.[39] And if the debtor was not represented by an attorney when the reaffirmation agreement was negotiated, the court must find that the

---

[34] 11 U.S.C. § 541(a)(6).

[35] 11 U.S.C. § 524(c).

[36] § 524(c)(1).

[37] § 524(c)(2).

[38] § 524(c)(3).

[39] § 524(c)(4).

U.S. Bankruptcy Court - Hawaii   #13-90060   Dkt # 97   Filed 07/22/15   Page 22 of 23

reaffirmation does not impose an undue hardship on the debtor and that reaffirmation is in the best interests of the debtor.

41.     These requirements were not satisfied. Therefore, James' statements after he filed his bankruptcy petition that he intended to repay the Benches do not create an enforceable legal obligation.

## CONCLUSION

Marilyn is entitled to judgment in her favor on all counts of the complaint. The Benches' counsel is directed to submit a proposed final judgment in favor of the Benches against James and Universal Fence, LLP, but against the Benches in favor of Marilyn.

## END OF FINDINGS AND CONCLUSIONS

U.S. Bankruptcy Court - Hawaii   #13-90060   Dkt # 97   Filed  07/22/15   Page 23 of 23